CLERK'S OFFICE U.S. DIST. COURT
AT ABINGDON, VA
FILED

MAR 2 7 2008

JOHN F. CORCORAN, CLERK
BY: _____
DEPUTY CLERK

# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
### BIG STONE GAP DIVISION

| | | |
|---|---|---|
| **WILLIAM R. SMITH,** | ) | |
| Plaintiff, | ) | Civil Action No. 2:07cv00043 |
| | ) | |
| | ) | |
| v. | ) | **MEMORANDUM OPINION** |
| | ) | |
| | ) | |
| **MICHAEL J. ASTRUE,** | ) | |
| **Commissioner of Social Security,** | ) | By: GLEN M. WILLIAMS |
| Defendant. | ) | SENIOR UNITED STATES DISTRICT JUDGE |

In this social security case, I will vacate the final decision of the Commissioner denying benefits and remand the case to the Commissioner for further consideration consistent with this Memorandum Opinion.

## I. Background and Standard of Review

The plaintiff, William R. Smith, filed this action challenging the final decision of the Commissioner of Social Security, ("Commissioner"), denying Smith's claims for disability insurance benefits, ("DIB"), and supplemental security income, ("SSI"), under the Social Security Act, as amended, ("Act"), 42 U.S.C.A. § 423 and § 1381 *et seq.* (West 2003 & Supp. 2007). Jurisdiction of this court is pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3).

The court's review in this case is limited to determining if the factual findings of the Commissioner are supported by substantial evidence and were reached through

application of the correct legal standards. *See Coffman v. Bowen*, 829 F.2d 514, 517 (4th Cir. 1987). Substantial evidence has been defined as "evidence which a reasoning mind would accept as sufficient to support a particular conclusion. It consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance." *Laws v. Celebrezze*, 368 F.2d 640, 642 (4th Cir. 1966). "'If there is evidence to justify a refusal to direct a verdict were the case before a jury, then there is "substantial evidence."'" *Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990) (quoting *Laws*, 368 F.2d at 642).

The record shows that Smith filed his applications for DIB and SSI on or about May 17, 2004, alleging disability as of November 30, 2003, due to kidney stones, mental problems, a spinal fracture and hypertension. (Record, ("R."), at 67-69, 121, 396-98.)[1] The claims were denied initially and on reconsideration. (R. at 54-60, 63-65, 399-408.) Smith then timely requested a hearing before an administrative law judge, ("ALJ"). (R. at 66.) The ALJ held a hearing on June 7, 2006, at which Smith was represented by counsel. (R. at 410-22.)

By decision dated November 15, 2006, the ALJ denied Smith's claims. (R. at 12-23.) The ALJ found that Smith met the insured status requirements of the Act for DIB purposes through December 31, 2008. (R. at 17.) The ALJ also found that Smith had not engaged in substantial gainful activity since November 30, 2003, the alleged onset date. (R. at 17.) The ALJ further determined that Smith suffered from severe impairments, namely depression/anxiety and chronic back pain. (R. at 17.) The ALJ

---

[1]Smith filed a prior application for disability, which was denied by an ALJ in 1999. (R. at 38-54.) After Smith's disability denial in 1999, Smith returned to work. (R. at 69.)

2

found, however, that Smith's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17.) The ALJ also found that Smith retained the residual functional capacity to perform the exertional demands required of light work,[2] and that he could perform unskilled jobs that involved one to two step tasks. (R. at 19.) Thus, the ALJ determined that Smith was unable to perform any past relevant work. (R. at 21.) The ALJ determined that transferability of jobs skills was not material to the determination of disability because the Medical-Vocational Guidelines, ("the Grids"), supported a finding that Smith was not disabled whether or not he had transferable job skills. (R. at 22.) The ALJ also found that, considering Smith's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Smith could perform. (R. at 22.) *See* 20 C.F.R. §§ 404.1560(c), 404.1566, 416.960(c), 416.966 (2007). As a result, the ALJ concluded that Smith was not under a disability as defined in the Act, and that he was not entitled to benefits. (R. at 22.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2007).

After the ALJ issued his decision, Smith pursued his administrative appeals, but the Appeals Council denied review, thereby making the ALJ's decision the final decision of the Commissioner. (R. at 5-8.) *See* 20 C.F.R. §§ 404.981, 416.1481 (2007). Thereafter, Smith filed this action seeking review of the ALJ's unfavorable decision. The case is before this court on the Plaintiff's Motion For Summary

---

[2]Light work involves lifting items weighing up to 20 pounds at a time with frequent lifting or carrying of items weighing up to 10 pounds. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2007). If an individual can perform light work, he can also perform sedentary work. *See* 20 C.F.R. §§ 404.1567(b), 416.967(b) (2007).

Judgment filed January 21, 2008, and on the Defendant's Motion For Summary Judgment filed February 20, 2008.

## II. Facts

Smith was born in 1960, which classifies him as a "younger person" under 20 C.F.R. §§ 404.1563(c), 416.963(c) (2007). (R. at 21, 679.) According to the record, Smith graduated from high school, completed one year of college and had vocational training as a diesel mechanic. (R. at 22, 127.) Smith has past relevant work experience as a truck driver, a police officer and a machine operator for a fiberglass manufacturer. (R. at 122.)

At a hearing before the ALJ on June 7, 2006, Smith testified that he had not sought employment since November 2003. (R. at 412.) Smith testified that he was currently being treated at the Veterans Affairs Medical Center, ("VA"), for a broken back, two bulging discs, one vertebra that was broken and never healed and degenerative disc disease. (R. at 413.) He stated that he also was treated for mental health problems, such as posttraumatic stress disorder, depression, anxiety and panic attacks. (R. at 414.) Smith testified that he was unable to sit or stand for longer than 10 to 15 minutes, was unable to walk very far, was limited in his ability to bend, could not stoop and could only carry items weighing up to 10 to 15 pounds. (R. at 414, 421.) Smith also testified that since leaving work in 2003, his condition forced him to lie down approximately 50 percent of the time. (R. at 414.) He stated that he lied down to help relieve his lower back pain, and that he was currently undergoing epidural treatment, which did "not seem to be helping." (R. at 415.) He noted that his first

4

epidural treatment did not provide him any relief, but instead, actually caused his pain to worsen. (R. at 415.) Smith also testified that he was a competitive power lifter for over twenty years, but that he no longer lifted weights competitively after breaking his back for the second time on September 29, 2001. (R. at 416.)

Smith testified that he threatened people when he became angry, and he last made such threats in November 2003. (R. at 417.) He reported that he took medication for his anger problem, and the medication helped him to control his temper and kept him "in balance." (R. at 417.) Smith also testified that he would probably be unable to "deal" with co-workers and with the public because he did not "deal with stress well at all." (R. at 418.) He further stated that he had anxiety and panic attacks once a week. (R. at 418-19.) Smith testified that he was diagnosed with posttraumatic stress disorder after having to shoot and kill someone while working as a police officer. (R. at 419-20.) He stated that the incident constantly bothered him; that he experienced flashbacks and dreams about the shooting; and that the incident caused him to have trouble concentrating. (R. at 420.) The ALJ did not introduce any testimony from a vocational expert. (R. at 421.)

In rendering his decision, the ALJ reviewed records from, among others, Wellmont Bristol Regional Medical Center; Ridgeview Pavilion; Dr. Linda R. Thompson, M.D.; Highlands Community Counseling Services; Dr. Glenn H. Birkitt, Jr. M.D.; Highlands Neurosurgery; Dr. Jim C. Brasfield, M.D.; Abingdon Primary Care; Woodridge Psychiatric Hospital; Dr. Donna McKenzie, M.D.; Dr. Terry C. Borel, M.D.; Dr. Paul Dereden, M.D.; Pain Medicine Associates; Dr. Sameh A. Ward, M.D.; Holston Medical Group; Dr. Todd Nairn, M.D.; Smyth County Community

5

Hospital; Dr. J. Travis Burt, M.D.; Dr. Alan Kolodziej, M.D.; Dr. Ghazi Ghanem, M.D.; Dr. Richard M. Surrusco, M.D., a state agency physician; Dr. Robert O. McGuffin, M.D., a state agency physician; Julie Jennings, Ph.D., a state agency psychologist; E. Hugh Tenison, Ph.D., a state agency psychologist; Mountain Home Virginia Medical Center; Dr. Atif A. Atyia, M.D.; Robert J. Finke, P.A.; Dr. Zahid Hameed, M.D.; and Dr. Pramod A. Shah, M.D.

The record shows that Smith sought treatment from Wellmont Bristol Regional Medical Center, ("BRMC"), from February 1, 2000, to February 4, 2000. (R. at 129-36.) On February 1, 2000, Smith was admitted to Ridgeview Pavilion, a secured adult inpatient psychiatric facility, on a voluntary basis because of increasing symptoms of anxiety and depression. (R. at 129.) A urine toxicology report was positive for cocaine. (R. at 129.) Smith was placed on level B suicide and homicide precautions for his and other patients' safety. (R. at 129.) Initially, Smith was depressed and acknowledged positive suicidal and homicidal ideations. (R. at 129.) A physical examination upon admission, by Dr. Linda R. Thompson, M.D., revealed that Smith's spine was straight with an area of tenderness over the lumbosacral area, which was secondary to a previous back injury; right costovertebral angle tenderness, which appeared secondary to kidney stones; and an area of marked tenderness in his right upper quadrant. (R. at 132.) Smith had a 1+ reflex in the left knee, but no reflexive response in the right knee. (R. at 132.) Smith was found to be alert and oriented to time, person, place and situation, and appeared to be moderately depressed and anxious. (R. at 133.) Dr. Thompson found Smith's affect to be blunted and found no evidence of a thought disorder. (R. at 133.) Dr. Thompson also found no evidence of overt psychosis, hallucinations, delusions or suicidal or homicidal ideation. (R. at

6

133.) Smith was diagnosed with probable intermittent explosive disorder; major depressive disorder, moderate without psychosis; personality disorder, not otherwise specified, ("NOS"), with cluster B features; recurrent kidney stones by history; renal failure by history; hypertension; gastroesophageal reflux disease, ("GERD"); status post fracture of his lower back secondary to a motor vehicle accident in June 1999; and frequent headaches. (R. at 133.) At admission, Dr. Thompson assessed Smith's global assessment of functioning, ("GAF"), at 35.[3] (R. at 133.)

Dr. Thompson noted that Smith reported being arrested on two different occasions for stalking his wife, one of which resulted in a not guilty finding and another that was pending. (R. at 129, 131.) He also reported having "idle threats about cutting his wife's head off but state[d] that he [did not] mean it." (R. at 131.) Smith denied any history of violence or any problems managing his temper. (R. at 131.) He reported that his anxiety was worse than his depression and reported increasingly severe insomnia over the past one to two months. (R. at 131.) Smith admitted to episodes of agitation but denied angry outbursts or violent behavior. (R. at 131.) Dr. Thompson noted that Smith's energy was generally low and his concentration was impaired. (R. at 131.) While at the hospital, Smith was seen by a substance abuse specialist through Highlands Community Counseling Services. (R. at 129.)

---

[3] The GAF scale ranges from zero to 100 and "[c]onsider[s] psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS FOURTH EDITION, ("DSM-IV"), 32 (American Psychiatric Association 1994). A GAF of 31-40 indicates some impairment in reality testing or communication or major impairment in several areas. DSM-IV at 32.

7

By the second day in the hospital, Smith reported improvement in his depression, and he was changed to level C suicide and homicide precautions. (R. at 129.) By his third day in the hospital, he was significantly less depressed, was less isolative and was no longer suicidal or homicidal. (R. at 129.) Smith was discharged from BRMC on February 4, 2000. (R. at 129-30.) At that time, Dr. Thompson reported that Smith was less depressed, was sleeping and eating well, was more interactive and was no longer suicidal or homicidal. (R. at 130.) At discharge, Smith's GAF was assessed at 50,[4] and he was diagnosed with intermittent explosive disorder; major depressive disorder, moderate without psychosis; personality disorder, not otherwise specified, ("NOS"), with cluster B features; recurrent kidney stones by history; renal failure by history; hypertension; gastroesophageal reflux disease, ("GERD"); status post fracture of his lower back secondary to a motor vehicle accident in June 1999; and frequent headaches. (R. at 130.) Smith was instructed to follow up with the Highlands Community Counseling Services Intensive Outpatient Substance Abuse Program and attend an anger management program. (R. at 130.)

Smith was again admitted to BRMC on September 29, 2001, after he was involved in a motorcycle accident. (R. at 137-39.) Smith's accident resulted in a mild closed head injury, a small subdural hematoma, left maxillary fractures and an L1 process fracture. (R. at 137-39.) A computerized axial tomography, ("CT"), scan of the head found a subdural hematoma, a CT scan of the neck was negative and CT scans of the abdomen, pelvis and chest revealed an L1 process fracture. (R. at 139.) While at BRMC, Dr. Glenn H. Birkitt Jr., M.D., noted that Smith had "a history of renal

---

[4]A GAF of 41-50 indicates that the individual has "[s]erious symptoms . . . OR any serious impairment in social, occupational, or school functioning . . . ." DSM-IV at 32.

8

failure related to kidney stones, but after the kidney stones were broken-up and removed, his renal failure resolved, without dialysis. This all occurred in Dallas several years ago." (R. at 138.) Smith was discharged on October 6, 2001. (R. at 137.)

Smith underwent tests and received treatment from Highlands Neurosurgery from October 9, 2001, to July 22, 2002. (R. at 140-51.) On October 9, 2001, a lateral view x-ray of Smith's lumbar spine revealed a compression fracture deformity at the L1 level of the spine, involving the superior end plate, with a 20 to 30 percent decrease in vertebral body height and anterior wedging. (R. at 151.) However, the x-ray revealed that Smith's alignment was maintained and that there was no significant evidence of retropulsed fragments. (R. at 151.) On October 12, 2001, a nuclear medicine bone scan of the whole body revealed a normal distribution of isotope throughout the skeletal system, except for the L1 level of the spine, where there was a slight band of increased uptake, which corresponded to a known fracture at the L1 level of the spine. (R. at 150.) On October 17, 2001, Smith presented to Dr. Jim C. Brasfield, M.D., for a follow-up regarding injuries sustained as a result of his motorcycle accident. (R. at 145.) Smith reported that his pain medicine was ineffective. (R. at 145.) As a result, Dr. Brasfield prescribed Smith Lortab and instructed him to decrease his activities. (R. at 145.)

On November 19, 2001, a lumbar view x-ray of the spine revealed a wedging injury/superior endplate compression at the L1 level of the spine. (R. at 149.) The x-ray revealed no evidence of spondylolisthesis nor any retropulsed fragments at the L1 level of the spine. (R. at 149.) On that same date, Smith presented to Dr. J. Travis

9

Burt, M.D., of Highlands Neurosurgery, and complained of low back pain, which had persisted since September 2001. (R. at 143.) He also complained of "vague headaches." (R. at 143.) Dr. Burt reported that Smith requested a change in neurosurgeons due to a personality clash with Dr. Brasfield. (R. at 143-44.) Smith reported that his lower back discomfort often became quite intense. (R. at 143.) He also reported that sitting increased his pain, but that his pain was immediately relieved when he stood and/or walked. (R. at 143.) Dr. Burt noted that Smith had a limited range of motion in his lumbar spine and noted mild, minimal tenderness with percussion of the spinous processes at the T12 to L1 or L2 levels of the spine. (R. at 144.) Dr. Burt diagnosed Smith with an L1 level of the spine compression fracture and a closed head injury secondary to concussion. (R. at 144.)

On January 2, 2002, a radiology report noted that Smith had a subacute compression fracture deformity of the L1 vertebral body, with no significant posterior displacement of the dorsal margin or evidence of bony spinal canal stenosis. (R. at 148.) On January 2, 2002, a magnetic resonance image, ("MRI"), of the lumbar spine revealed that Smith had a compression fracture deformity of the L1 vertebral body, predominantly involving the mid to anterior portion of the superior endplate. (R. at 147.) The MRI also revealed no significant posterior displacement of the dorsal margin, and "a high T2 signal alteration of the bone marrow of the mid to anterior portion of the L1 vertebral body." (R. at 147.) On that same date, Smith reported that he was feeling better and that his lower back pain had decreased. (R. at 142.) The record indicates that Smith was anxious to return to work and power lifting. (R. at 142.)

10

On January 21, 2002, Smith reported back pain but again noted that he was anxious to return to work. (R. at 141.) At that time, Smith was restricted to lifting items weighing up to 25 pounds. (R. at 141.) Smith was prescribed Motrin and Darvocet for pain. (R. at 141.) On July 22, 2002, an x-ray of the lumbar spine revealed a mild to moderate compression fracture of the L1 level of the spine with sclerosis about the superior end plate. (R. at 146.) At that time, Smith reported some periodic low back pain, but stated that he was doing quite well and wished to return to work without restrictions. (R. at 140.)

Smith was treated at Abingdon Primary Care, ("APC"), from December 3, 2002, to September 22, 2003. (R. at 152-70.) While a patient at APC, Smith complained of back pain and tenderness, (R. at 155, 161, 163, 165-68), difficulty sleeping, (R. at 166, 168), and anxiety, (R. at 166, 168). On February 28, 2003, Smith was seen as a walk-in patient after reporting that he had a fractured elbow and needed a refill of his pain medication. (R. at 164.) On July 29, 2003, an otherwise unremarkable MRI of the left knee revealed minimal fluid in the joint space and minimal edema in the subcutaneous fat anterior to the knee. (R. at 170, 221.) A medication summary list from APC, compiled over the course of his treatment, indicated that Smith was prescribed Xanax, Percocet, Altace, atenolol, Ultracet and Lortab. (R. at 169.)

Smith was admitted to Woodridge Psychiatric Hospital, ("Woodridge"), on November 30, 2003. (R. at 171-76.) Smith was voluntarily admitted to Woodridge after he began to have thoughts of killing his supervisor. (R. at 173.) Smith reported increased stress as a result of work and due to the fact that he had been living out of his car for about a week. (R. at 173.) He reported suicidal ideations, nightmares and loss

11

of sleep. (R. at 173.) He also reported that he killed people when he was a soldier, and that he had stayed away from work for two weeks because he did not want to kill his supervisor. (R. at 173.) Dr. Donna McKenzie, M.D., noted that Smith exhibited hypervigilance, social avoidance and emotional blunting, but that he had no psychotic symptoms or history of mania. (R. at 173.) Smith admitted to smoking marijuana about three times a week, while a urine drug screen was positive for amphetamines, benzodiazepines, cannabinoids and opiates. (R. at 171, 173.) Smith was found to have a full range of motion in all his limbs with no muscular weakness. (R. at 174.) However, it was noted that Smith had a decreased range of motion in his back. (R. at 175.) Dr. McKenzie also noted that Smith was severely depressed and morbidly obese. (R. at 175.) He was diagnosed with posttraumatic stress disorder with depressed mood; cannabis abuse; and his GAF was assessed at 25.[5] (R. at 176.) Dr. McKenzie placed Smith on detoxification precautions, and Smith's Xanax prescription was discontinued due to his active marijuana use. (R. at 176.)

Smith was discharged from Woodridge on December 2, 2003. (R. at 171-72.) At that time, Dr. Terry C. Borel, M.D., noted that Smith showed a rapid improvement in his condition and never manifested any symptoms of psychosis, organicity or mania. (R. at 171.) Dr. Borel reported that Smith's employer "specifically stated that [Smith] had been terminated from his job," while Smith stated he "was glad that he had been terminated because [] he did not feel [] he would be able to return to work anyway." (R. at 171.) Smith also suggested that he did not "have any intention or real desire . . .

---

[5] A GAF of 21-30 indicates that the individual's behavior is considerably influenced by delusions of hallucinations or serious impairment in communication or judgment or an inability to function in almost all areas. DSM-IV at 32.

12

and did not have any plans on hurting his supervisor at the time he left the hospital."
(R. at 171.) Smith was given a final diagnosis of adjustment disorder with mixed
emotional features and back pain, and his GAF was assessed at 55.[6] (R. at 171.)

Smith was treated at BRMC from July 17, 2000, to December 3, 2003. (R. at
177-90.) On July 17, 2000, and December 24, 2002, Smith's blood pressure was
reported as elevated. (R. at 187, 189.) Smith reported to BRMC on February 17,
2003, with complaints of pain in his left elbow. (R. at 183-85.) Dr. Paul Derden,
M.D., found that Smith had tenderness around the left elbow with slight swelling, was
unable to extend his elbow beyond 30 degrees without pain and was unable to pronate
or supinate without difficulty. (R. at 184.) X-rays of the left elbow revealed a fracture
present in the anterior aspect of the radial head. (R. at 185.) Smith was given a
prescription for Percocet, placed in a posterior splint and sling and ordered off work
until released by an orthopedic specialist. (R. at 184.)

On November 11, 2003, Smith presented to the BRMC emergency room,
("ER"), with pain in his lower back, which he said started a couple days prior to his
visit after "working fairly hard." (R. at 180-82.) A straight leg raise test was negative
and his deep tendon reflexes were 1-2+. (R. at 181.) Smith was given an injection of
Norflex and prescribed Anaprox DS and Robaxin for pain control. (R. at 182.) Smith
returned to the ER on December 3, 2003, complaining of lower back pain, which
radiated down his left leg. (R. at 177-79.) Smith informed the ER physician that he

---

[6]A GAF of 51-60 indicates that the individual has "[m]oderate symptoms ... OR moderate
difficulty in social, occupational, or school functioning . . . ." DSM-IV at 32.

13

had been sleeping in his car, which caused his lower back pain to worsen. (R. at 178.) Smith was diagnosed with an acute exacerbation of his chronic lower back pain and was offered muscle relaxants and anti-inflammatory medications for his pain. (R. at 178.) Smith became upset after being denied narcotics and left stating, "none of that stuff works" and that he "waited in the emergency room for hours for nothing." (R. at 178-79.)

Smith presented to Dr. Sameh A. Ward, M.D., at Pain Medicine Associates, on January 22, 2004, with chief complaints of pain in his lower back, left buttocks and both knees. (R. at 191-93.) Smith complained of sharp pain going down the left leg, numbness over his left thigh and knee joint pain secondary to power lifting and walking on concrete. (R. at 191.) Smith informed Dr. Ward that lifting more than 50 pounds above his head caused his pain to worsen. (R. at 191.) He also reported that getting out of a car, climbing stairs, sitting, standing, lying down, bending forward, bending backward, twisting, coughing and sneezing increased his pain. (R. at 191.) Smith was found to walk with a normal gait and without the use of a cane, walker or assistance. (R. at 192.) Dr. Ward also found that Smith's deep tendon reflexes were normal, his nerve root stretch signs in both the sitting and supine positions were negative and his motor and sensory examinations were unremarkable. (R. at 192.) It was noted that Smith "exhibit[ed] exaggerated pain behaviors." (R. at 192.) Smith was scheduled for lumbar epidural steroid injections to help decrease the amount of inflammation and pain and prescribed Topamax to help with his radiculopathy and weight loss. (R. at 192.)

14

Smith was seen by physicians at Holston Medical Group from November 6, 2002, to January 26, 2004. (R. at 194-221.) On October 23, 2003, Smith presented to Dr. Todd Nairn, M.D., complaining of bilateral knee pain due to lack of pain medications. (R. at 205-06.) Dr. Nairn noted that Smith's blood pressure was elevated because of noncompliance with his blood pressure medication. (R. at 205.) Dr. Nairn also found a decreased range of motion secondary to Smith's pain in his lumbar spine. (R. at 205.) A straight leg raise test was negative bilaterally. (R. at 205.) Dr. Nairn noted that both of Smith's knees were inflamed with palpable crepitus and edema. (R. at 205.) Smith was diagnosed with degenerative disc disease, back pain, anxiety, depression and bilateral knee pain. (R. at 205.) He was prescribed Percocet for his back pain and Xanax for his anxiety and depression. (R. at 205.)

On January 26, 2004, Smith presented to Dr. Nairn for a follow-up regarding his degenerative disc disease. (R. at 194-97.) Smith had chief complaints of anxiety and low back pain that radiated down both his legs. (R. at 194-97.) He was diagnosed with degenerative disc disease, back pain, anxiety, depression and hypertension. (R. at 194, 196.) Dr. Nairn instructed Smith to continue taking his pain medication and suggested that Smith follow up with Dr. Ward at the Pain Clinic in Bristol. (R. at 194, 196.) Dr. Nairn also prescribed Valium for Smith's symptoms of anxiety and depression and instructed Smith to continue taking atenolol and chlorthalidone for his hypertension. (R. at 194, 196.)

Smith reported to the Smyth County Community Hospital ER via ambulance on April 14, 2004, with complaints of back and neck pain following an automobile accident. (R. at 222-28.) Smith was diagnosed with an abrasion to his chin and a

15

cervical sprain or strain. (R. at 224.) He was prescribed Toradol and Robaxin. (R. at 224.) An x-ray of the anteroposterior, ("AP"), and left lateral chest revealed no acute fracture, but did reveal evidence of a possible old fracture in the left second rib. (R. at 225.) An x-ray of the cervical spine revealed no spasm, fracture or acute finding. (R. at 226.) An x-ray of the lumbar spine found an acute fracture of the L1 level of the spine, an abnormal narrowing of the T12-L1 disc space and a possible subtle buckle fracture of the L2 vertebral body. (R. at 227.) An x-ray of the AP pelvis revealed no fracture or acute finding. (R. at 228.)

Dr. Richard M. Surrusco, M.D., a state agency physician, completed a Physical Residual Functional Capacity Assessment, ("PRFC"), on October 8, 2004. (R. at 229-39.) Dr. Surrusco found that Smith could occasionally lift and/or carry items weighing up to 20 pounds, frequently lift and/or carry items weighing up to 10 pounds, that he could stand and/or walk and/or sit for a total of about six hours in a typical eight-hour workday and that Smith had an unlimited ability to push and/or pull in his upper and lower extremities. (R. at 230.) Dr. Surrusco concluded that Smith had no manipulative, visual, communicative or environmental limitations. (R. at 232-34.) However, Dr. Surrusco established that Smith could only occasionally climb ramps, stairs, ladders, ropes and scaffolds, and that he could only occasionally balance, stoop, kneel, crouch and crawl. (R. at 232.) Smith's allegations regarding his symptoms were found to be partially credible. (R. at 231.) Dr. Robert O. McGuffin, M.D., another state agency physician, affirmed Dr. Surrusco's findings on December 2, 2004. (R. at 236.)

A Mental Residual Functional Capacity Assessment, ("MRFC"), was completed on October 12, 2004, by Julie Jennings, Ph.D., a state agency psychologist. (R. at 240-43.) Jennings indicated that Smith had a moderately limited ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; to sustain an ordinary routine without special supervision; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to set realistic goals or make plans independently of others. (R. at 240-41.) Jennings also indicated that she could not find evidence of a limitation in Smith's ability to maintain socially appropriate behavior or his ability to adhere to basic standards of neatness and cleanliness. (R. at 241.) She reported that Smith would be restricted to simple, unskilled, non-stressful work. (R. at 242.) Smith's allegations regarding his symptoms were found to be partially credible. (R. at 242.) E. Hugh Tenison, Ph.D., another state agency psychologist, reviewed Jennings's report and affirmed her findings on December 6, 2004. (R. at 242.)

Jennings also completed a Psychiatric Review Technique form, ("PRTF"), on October 12, 2004. (R. at 244-57.) Jennings indicated that Smith suffered from a disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness or difficulty concentrating or thinking. (R. at 247.) She also indicated that Smith suffered from an anxiety related disorder characterized by

17

predominant disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by generalized persistent anxiety accompanied by motor tension and as evidenced by recurrent, severe panic attacks. (R. at 249.) Jennings concluded that Smith had moderate limitations on activities of daily living, in maintaining social functioning and in maintaining concentration, persistence or pace. (R. at 254.) She also concluded that Smith had experienced one or two episodes of decompensation. (R. at 254.) Tenison reviewed Jennings's report and affirmed her findings on December 6, 2004. (R. at 244.)

Smith was treated at the Mountain Home VA from April 25, 2001, to August 18, 2006. (R. at 258-395.) Smith was seen for hypertension and knee pain on May 17, 2001. (R. at 384-86.) Smith's electrocardiogram, ("EKG"), examination was noted to be markedly abnormal, and he was referred to cardiology. (R. at 386.) He also was diagnosed with degenerative joint disease in both knees. (R. at 386.) On June 26, 2001, Smith underwent an exercise cardiolite stress test, and it was noted that Smith was able to perform an excellent amount of exercise. (R. at 383.) A myocardial perfusion scan performed on that same date was found to be normal. (R. at 273-79, 310-14.)

Smith reported to the VA on July 12, 2002, with a chief complaint of worsening chronic lower back pain. (R. at 380-82.) Smith characterized the pain as an ache. (R. at 381.) Smith was found to be calm and cooperative and was diagnosed with back pain. (R. at 380, 382.) Smith returned to the VA on November 15, 2003, with continued complaints of back pain. (R. at 377-80.) Smith reported that his back pain was sharp and radiated down his left leg. (R. at 379.) He was diagnosed with chronic

18

lower back pain. (R. at 377.) Smith returned on December 3, 2003, with continued complaints of back pain, which had worsened since "he ha[d] been sleeping in his car." (R. at 375-77.) Smith denied any trauma or injury and noted that the pain radiated down both legs. (R. at 375.) A straight leg raise test was negative up to 100 degrees bilaterally and there was no pain or tenderness on palpation of the spine. (R. at 375.) Dr. Atif A. Atyia, M.D., reported that Smith was offered a Toradol shot, Fioricet and a muscle relaxant, but declined and stated that the "only meds helping the pain are hydrocodone [sic] or [P]ercocet." (R. at 375.) Smith also stated that he might "go to another ER." (R. at 375.) Robert J. Finke, P.A., evaluated Smith for complaints of chronic lower back pain and anxiety on January 28, 2004. (R. at 365-74.) Smith requested a mental health consultation and noted that he was recently hospitalized at Woodridge for homicidal and suicidal behavior. (R. at 365.) Smith reported depression, anxiety, suicidal thoughts and homicidal thoughts, and he appeared anxious. (R. at 368.) Smith had a full active and passive range of motion, had no edema or swelling, had no tenderness or deformities but had bilateral upper extremity tremors. (R. at 369.) His spine was straight with no tenderness or paraspinal spasms. (R. at 369.) Smith was diagnosed with obesity, hypertension by history, an L1 compression fracture by history and anxiety. (R. at 370.) Finke ordered a trial of Lortab for pain control. (R. at 370.) Smith reported that he had prescriptions for Xanax and Percocet, but was unable to afford the medications. (R. at 372.)

Smith presented to Dr. Zahid Hameed, M.D., at the VA, on January 28, 2004, and his chief complaint was reported as, "I need something for anxiety and panic attacks." (R. at 361-63.) Smith admitted to manic symptoms and increasingly more frequent panic attacks. (R. at 361.) He denied having suicidal or homicidal thoughts

19

and drinking alcohol or using drugs. (R. at 361.) Smith reported being annoyed, restless and irritable most of the time. (R. at 361.) Dr. Hameed assessed Smith with generalized anxiety disorder, ("GAD"), panic disorder without agoraphobia, and he ruled out bipolar disorder. (R. at 363.) Smith's GAF was assessed at 55, and he was prescribed venlafaxine and Ambien. (R. at 363.)

Smith returned to the VA on March 1, 2004, with complaints of lower back pain. (R. at 356-59.) Smith requested Percocet pain medication because Lortab upset his stomach and was ineffective in controlling his pain. (R. at 356-59.) He was given Percocet for 30 days and was instructed that he would be required to bring in his records from his primary physician before any more Percocet would be prescribed. (R. at 356.) Smith also was instructed on the need for weight loss and was scheduled for a lumbar spine x-ray. (R. at 356.) The record indicated that Smith stated he was unemployed because of his lower back pain. (R. at 357.) X-rays of the lumbosacral spine taken on March 1, 2004, revealed a compression fracture involving the superior end plate of the L1 level of the spine and degenerative changes involving the T12-L1 levels of the spine, but no significant subluxation. (R. at 272.)

On March 22, 2004, Smith again presented to the VA, with a complaint of chronic lower back pain. (R. at 353-56.) Smith failed to bring his medical records to the visit, but it was noted that he was walking and had lost two pounds. (R. at 355.) Smith presented for physical therapy on March 24, 2004, with chief complaints of lower back pain and requested a mental health consultation. (R. at 305-10, 351-52.) It was noted that Smith would benefit from physical therapy intervention. (R. at 352.)

20

On March 25, 2004, Smith reported to Dr. Pramod A. Shah, M.D., with complaints of anxiety and depression. (R. at 346-50.) Dr. Shah noted that Smith was alert, oriented and cooperative, with a constricted affect. (R. at 349.) He also noted no suicidal or homicidal risk. (R. at 349.) Smith was diagnosed with recurrent major depression; anxiety disorder, NOS; and personality disorder. (R. at 350.) His GAF was assessed at 50. (R. at 350.) On March 31, 2004, Smith informed the VA that Percocet controlled his pain much better, but he was still unable to do as much as he was able to do in the past. (R. at 343-45.) Smith was diagnosed with hypertension, chronic back pain, anxiety and mixed hyperlipidemia. (R. at 345.)

Smith presented to the VA on April 20, 2004, and reported that he was involved in a multiple vehicle accident seven days prior to his visit. (R. at 339.) Smith presented to the VA for a follow-up and to report that the Percocet tablets he received from the emergency room were stolen from his car. (R. at 339.) Smith's motor strength was 5/5 in all four extremities, his reflexes were symmetrical bilaterally and he had a normal and steady gait. (R. at 340.) Dr. Alan Kolodziej, M.D., reported that no neurological deficits were present. (R. at 340.) X-rays of the cervical spine and thoracic spine revealed no acute fracture or subluxation of the cervical spine. (R. at 270-71.) X-rays of the lumbosacral spine revealed a compression fracture of the superior end-plate at the L1 level of the spine, which appeared old. (R. at 269-70.) Smith was prescribed ibuprofen and Flexeril, and he received injections of Toradol and Decadron. (R. at 340-41.) Smith attended an orthopedic consultation on April 21, 2004, and again requested Percocet for his pain. (R. at 337.) Smith was encouraged to wear his cervical collar and was prescribed methocarbamol, Fioricet and Percocet. (R. at 302-03, 336-37.)

21

On May 11, 2004, Smith telephoned the VA and requested a change in his Percocet dosage because he mistakenly took the medication at his previous dose of two tablets every six hours and not the prescribed dose of one to two tablets every eight hours. (R. at 336.) On May 20, 2004, Smith reported that his cervical spine symptoms had resolved, and he was discharged from care at the VA orthopedic clinic. (R. at 331-35.) X-rays of the cervical spine revealed no fracture or subluxation. (R. at 269.) Smith again presented to the VA on May 28, 2004, for a follow-up visit regarding injuries suffered as a result of his car accident. (R. at 329-31.) Dr. Ghazi Ghanem, M.D., indicated that Smith's blood pressure was "doing well" and that his x-rays were normal. (R. at 329.) A straight leg raise test revealed pain at 20 degrees on the left and 30 degrees on the right. (R. at 330.) On August 20, 2004, Smith presented to the VA for a follow-up visit and it was again noted that Smith's blood pressure was "doing well," but that he had gained 33 pounds in the previous year. (R. at 324.) Smith complained that he continued to have chronic back pain, and that he experienced increased right leg pain when pressure was applied to his leg. (R. at 324.) A straight leg raise test again revealed pain at 20 degrees on the left and 30 degrees on the right. (R. at 325.) Smith was instructed to exercise and was encouraged to lose weight. (R. at 325.) On August 23, 2004, the VA's records indicate that a back support was ordered for Smith and would be mailed to his home. (R. at 322.)

On September 20, 2004, Smith attended a nutrition consultation where he was given meal plans and was informed about portion control and weight reduction. (R. at 318-19.) He acknowledged that he had used anabolic steroids about five years prior to his visit. (R. at 318.) At Smith's medication follow-up visit on that same date, he

22

reported feeling increased depression and anxiety, feelings of hopelessness and helplessness and crying spells. (R. at 320-21.) He was diagnosed with major depression disorder, recurrent; anxiety disorder, NOS; and personality disorder, NOS. (R. at 321.) Smith's GAF was assessed at 50 and he was prescribed Zoloft. (R. at 321.) On October 7, 2004, Smith attended a group session discussing pain management and narcotic treatment. (R. at 318.) On October 14, 2004, Smith reported continued severe back pain that radiated down his right leg, and stated that he had recently been under a lot of stress.[7] (R. at 318.) On November 23, 2004, Smith was diagnosed with an impaired gait and issued a cane to assist with walking. (R. at 315.)

Smith returned to the VA on August 18, 2006, complaining of continued and increased chronic back pain. (R. at 260-65.) Smith's blood pressure was elevated and he was instructed on the importance of diet and weight control. (R. at 262-63.) Smith informed the VA that his blood pressure medication "ran out and no one said anything about it" so he stopped taking the medication. (R. at 265.) Smith also was counseled on the importance of regular exercise, but reported that it was harder for him to exercise because of his back pain. (R. at 263.) He reported having anxiety but that his depression was relieved by medication. (R. at 263.) Smith was diagnosed with lower back pain, hypertension, obesity, hyperlipidemia, anxiety and depression. (R. at 265.)

*III. Analysis*

---

[7] Portions of the medical record from this date appear to be missing from the record. (R. at 315-16.)

The Commissioner uses a five-step process in evaluating DIB and SSI claims. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007); *see also Heckler v. Campbell*, 461 U.S. 458, 460-62 (1983); *Hall v. Harris*, 658 F.2d 260, 264-65 (4th Cir. 1981). The process requires the Commissioner to consider, in order, whether a claimant 1) is working; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of a listed impairment; 4) can return to his past relevant work; and 5) if not, whether he can perform other work. *See* 20 C.F.R. §§ 404.1520, 416.920 (2007). If the Commissioner finds conclusively that a claimant is or is not disabled at any point in the process, review does not proceed to the next step. *See* 20 C.F.R. §§ 404.1520(a), 416.920(a) (2007).

Under this analysis, a claimant has the initial burden of showing that he is unable to return to his past relevant work because of his impairments. Once the claimant establishes a prima facie case of disability, the burden shifts to the Commissioner. To satisfy this burden, the Commissioner must then establish that the claimant has the residual functional capacity, considering the claimant's age, education, work experience and impairments, to perform alternative jobs that exist in the national economy. *See* 42 U.S.C.A. §§ 423(d)(2)(A), 1382c(a)(3)(A)-(B) (West 2003 & Supp. 2007); *McLain v. Schweiker*, 715 F.2d 866, 868-69 (4th Cir. 1983); *Hall*, 658 F.2d at 264-65; *Wilson v. Califano*, 617 F.2d 1050, 1053 (4th Cir. 1980).

By decision dated November 15, 2006, the ALJ denied Smith's claims. (R. at 12-23.) The ALJ found that Smith met the insured status requirements of the Act for DIB purposes through December 31, 2008. (R. at 17.) The ALJ also found that Smith had not engaged in substantial gainful activity since November 30, 2003, the alleged

onset date. (R. at 17.) The ALJ further determined that Smith suffered from severe impairments, namely depression/anxiety and chronic back pain. (R. at 17.) The ALJ found, however, that Smith's impairments did not meet or medically equal the requirements of any impairment listed at 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. at 17.) The ALJ also found that Smith retained the residual functional capacity to perform the exertional demands required of light work, and that he could perform unskilled jobs that involved one to two step tasks. (R. at 19.) Thus, the ALJ determined that Smith was unable to perform any past relevant work. (R. at 21.) The ALJ determined that transferability of jobs skills was not material to the determination of disability because the Grids supported a finding that Smith was not disabled whether or not he had transferable job skills. (R. at 22.) The ALJ also found that, considering Smith's age, education, work experience and residual functional capacity, there were jobs that existed in significant numbers in the national economy that Smith could perform. (R. at 22.) *See* 20 C.F.R. §§ 404.1560(c), 404.1566, 416.960(c), 416.966 (2007). As a result, the ALJ concluded that Smith was not under a disability as defined in the Act, and that he was not entitled to benefits. (R. at 22.) *See* 20 C.F.R. §§ 404.1520(g), 416.920(g) (2007).

Smith argues that the ALJ's decision was not supported by substantial evidence. (Plaintiff's Brief In Support Of Motion For Summary Judgment, ("Plaintiff's Brief"), at 8-20.) Specifically, Smith argues that the ALJ failed to properly consider the severity of his mental impairments and limitations. (Plaintiff's Brief at 10-15.) Secondly, Smith argues that the ALJ erred in determining his residual functional capacity. (Plaintiff's Brief at 15-18.) Thirdly, Smith argues that the Commissioner has failed to sustain his burden of establishing that there is work in the national economy that Smith can perform. (Plaintiff's Brief at 18-20.)

The court's function in this case is limited to determining whether substantial evidence exists in the record to support the ALJ's findings. This court must not weigh the evidence, as this court lacks authority to substitute its judgment for that of the Commissioner, provided his decision is supported by substantial evidence. *See Hays*, 907 F.2d at 1456. In determining whether substantial evidence supports the Commissioner's decision, the court also must consider whether the ALJ analyzed all of the relevant evidence and whether the ALJ sufficiently explained his findings and his rationale in crediting evidence. *See Sterling Smokeless Coal Co. v. Akers*, 131 F.3d 438, 439-40 (4th Cir. 1997).

Thus, it is the ALJ's responsibility to weigh the evidence, including the medical evidence, in order to resolve any conflicts which might appear therein. *See Hays,* 907 F.2d at 1456; *Taylor v. Weinberger*, 528 F.2d 1153, 1156 (4th Cir. 1975). Specifically, the ALJ must indicate that he has weighed all relevant evidence and must indicate the weight given to this evidence. *See Stawls v. Califano*, 596 F.2d 1209, 1213 (4th Cir. 1979.) While an ALJ may not reject medical evidence for no reason or for the wrong reason, *see King v. Califano*, 615 F.2d 1018, 1020 (4th Cir. 1980), an ALJ may, under the regulations, assign no or little weight to a medical opinion, even one from a treating source, based on the factors set forth at 20 C.F.R. §§ 404.1527(d), 416.927(d), if he sufficiently explains his rationale and if the record supports his findings.

Smith's first argument is that the ALJ failed to properly consider the severity of his mental impairments and limitations. (Plaintiff's Brief at 10-15.) I agree. After discussing the findings of Julie Jennings, a state agency psychologist, the ALJ stated that he "agree[d] with the conclusions of the state agency consultants." (R. at 21.)

26

However, the ALJ did not incorporate the entire findings of Jennings into Smith's mental residual functional capacity and gave no reason for dismissing any portion of her findings. For instance, Jennings concluded that Smith would be restricted to simple, unskilled, non-stressful work. (R. at 242.) However, the ALJ made no mention in his opinion that Smith would be limited to non-stressful work. Further, while the ALJ mentioned Jennings's conclusions that Smith had moderate limitations on activities of daily living and in maintaining social functioning and that Smith had experienced one or two episodes of decompensation, the ALJ never incorporated any of these limitations into Smith's mental residual functional capacity. (R. at 21, 254.)

Jennings also indicated that Smith had a moderately limited ability to understand, remember and carry out detailed instructions; to maintain attention and concentration for extended periods; to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerance; to sustain an ordinary routine without special supervision; to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; to interact appropriately with the general public; to accept instructions and respond appropriately to criticism from supervisors; and to set realistic goals or make plans independently of others. (R. at 240-41.) Again, although the ALJ stated that he agreed with Jennings, the ALJ made no mention of these limitations in his opinion and did not incorporate any of these limitations into Smith's mental residual functional capacity, other than to note that Smith is limited to one to two step tasks. (R. at 21.) Further, Jennings indicated that Smith suffered from a disturbance of mood, accompanied by a full or partial manic or depressive syndrome, as evidenced by psychomotor agitation or retardation, decreased energy, feelings of guilt or worthlessness or difficulty

27

concentrating or thinking. (R. at 247.) Jennings also indicated that Smith suffered from an anxiety related disorder characterized by predominant disturbance or anxiety experienced in the attempt to master symptoms, as evidenced by generalized persistent anxiety accompanied by motor tension and as evidenced by recurrent, severe panic attacks. (R. at 249.) Again, the ALJ made no mention as to why these findings were not considered in determining Smith's mental residual functional capacity. Additionally, the ALJ referred to findings of Dr. Shah and stated that, "Dr. Shah indicated that the claimant had a moderate impairment." (R. at 21.) However, Dr. Shah diagnosed Smith with recurrent major depression; anxiety disorder, NOS; and personality disorder. (R. at 350.) Dr. Shaw also assessed Smith's GAF at 50, (R. at 350), which indicated that Smith had "[s]erious symptoms ... OR [a] serious impairment in social, occupational, or school functioning ...." DSM-IV at 32. On remand, the ALJ should explicitly indicate the reasons for dismissing the conclusions of healthcare professionals whom he expressly agrees with. The ALJ should analyze all evidence and sufficiently explain the weight he has given to obviously probative exhibits. *Arnold v. Sec'y of Health, Educ. & Welfare*, 567 F.2d 258, 259 (4th Cir. 1977) (quoting *Oppenheim v. Finch*, 495 F.2d 396, 397 (4th Cir. 1974)).

Smith's second argument is that the ALJ erred in determining his residual functional capacity. (Plaintiff's Brief at 15-18.) An individual's residual functional capacity is defined as the most an individual can do despite the limitations caused by his physical and/or mental impairments. *See* 20 C.F.R. §§ 404.1545(a), 416.945(a) (2007); *see also Smith v. Heckler*, 782 F.2d 1176, 1180 (4th Cir. 1986). Because I have already considered Smith's mental residual functional capacity, I will not repeat that analysis here. With respect to Smith's physical impairments, the ALJ failed to indicate why he dismissed portions of the state agency physician's findings, while

28

asserting that he agreed with them in his opinion. Dr. Surrusco, a state agency physician, completed a PRFC, on October 8, 2004. (R. at 229-39.) The ALJ references this PRFC and describes Dr. Surrusco's findings by stating that, "a medical consultant found that the claimant could perform lifting up to twenty pounds occasionally and ten pounds frequently and he could sit, stand and/or walk for about six hours each in a normal eight-hour work day with no exposure to fumes, gases, etc." (R. at 21.) However, Dr. Surrusco concluded that Smith had no environmental limitations and it is unclear why the ALJ stated that Dr. Surrusco found that Smith should have no exposure to fumes, gases, etc. (R. at 234.) Moreover, Dr. Surrusco established that Smith could only occasionally climb ramps, stairs, ladders, ropes and scaffolds and could only occasionally balance, stoop, kneel, crouch and crawl. (R. at 232.) Despite stating that he agrees with the conclusions of the state agency consultants, and that his "decision that the claimant is disabled is supported by the determinations of the [s]tate agency physicians," none of these postural limitations, or any explanation why they are not included, are in the ALJ's determination of Smith's residual functional capacity. As stated earlier, on remand, the ALJ should explicitly indicate the reasons for dismissing the conclusions of healthcare professionals whom he states he agrees with.

Smith's third argument is that the Commissioner has failed to sustain his burden of establishing that there is work in the national economy that Smith can perform. (Plaintiff's Brief at 18-20.) Again, I agree. The crux of the problem lies in the ALJ's use of the Grids after finding that Smith can perform light, unskilled work, with one to two step tasks. (R. at 19.) The Grids are inadequate, however, in the case of a claimant who suffers a disability in the absence of physical exertion. *See Hammond v. Heckler*, 765 F.2d 424, 425-26 (4th Cir. 1985) (citing *Hall v. Harris*, 658 F.2d 260 (4th

29

Cir. 1981)). As instructed by the United States Court of Appeals for the Fourth Circuit in *Grant v. Schweiker*, 699 F.2d 189, 192 (4th Cir. 1983), an ALJ may not conclusively apply the Grids where "nonexertional impairments exist in tandem with exertional limitations; instead individualized consideration must be given." In *Smith v. Schweiker*, 719 F.2d 723, 725 (4th Cir. 1984), the Fourth Circuit noted that the proper inquiry under *Grant* is "whether a given nonexertional condition affects an individual's residual functional capacity to perform work of which he is exertionally capable." A nonexertional impairment has been defined as one that is not manifested by loss of strength or other physical abilities. *See Grant*, 699 F.2d at 192. The Social Security Regulations, ("Regulations"), recognize that the Grids only describe "major functional and vocational patterns." 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(a) (2007); *Heckler v. Campbell*, 461 U.S. 458, 462 n.5 (1983). If an individual's capabilities are not described accurately by the Grids, the Regulations make clear that the individual's particular limitations must be considered. *See* 20 C.F.R. pt. 404, subpt. P, app. 2, § 200.00(a),(d) (2007); *Heckler*, 461 U.S. at 462 n.5. Thus, the Regulations provide that the Grids will be applied only when they describe a claimant's abilities and limitations accurately. *Heckler*, 461 U.S. at 462 n.5.

In this case, the ALJ's own determination of Smith's residual functional capacity includes a nonexertional limitation, namely that he is limited to one to two step tasks. Aside from this determination, the ALJ failed to explain his reasoning for not including, as noted above, many other nonexertional limitations placed on Smith from state agency psychologists and physicians. On remand, the ALJ should determine the types and numbers of jobs that exist in the national economy by introducing the testimony of a vocational expert or by determining, with proper explanation and

Case 2:07-cv-00043-GMW-PMS Document 14 Filed 03/27/08 Page 30 of 31 PageID#: 87

rationale, that Smith's residual functional capacity does not include nonexertional impairments. *See Heckler v. Campbell*, 461 U.S. 458, 468 (1983).

## *IV. Conclusion*

For the foregoing reasons, I will deny the Commissioner's motion for summary judgment and Smith's motion for summary judgment. The Commissioner's decision denying benefits will be vacated, and the case will be remanded to the ALJ for further consideration of Smith's residual functional capacity and ability to work.

An appropriate order will be entered.

**ENTER:** This 27th day of March, 2008.

THE HONORABLE GLEN M. WILLIAMS
SENIOR UNITED STATES DISTRICT JUDGE